No. 13,205.

Mrs. Julia Knoker vs. Canal and Claiborne Railroad Company.

SYLLABUS.

Where a pedestrian is standing near a car track, at night, upon a frequented thoroughfare, giving no indication of an intention to cross, and attempts to cross only when a rapidly moving car is so near him as to render it practically impossible for the motorneer to prevent striking him, there can be no recovery of damages for the injuries sustained.

APPEAL from the Civil District Court, Parish of Orleans. *Theard, J.*

*Bernard Bruenn* for Plaintiff, Appellant.

*Clegg & Quintero* for Defendant, Appellee.

The opinion of the court was delivered by

MONROE, J. Plaintiff, as the surviving, and dependent, mother of August Knoker, sues to recover damages resulting from her son's death, through the alleged fault of the defendant. The answer denies liability, and alleges that the decedent came to his death through his own fault. The case was tried in the court *a qua* without a jury, and, from a judgment rejecting her demand, the plaintiff has appealed.

After a careful consideration of the evidence, we find the following facts therefrom, to-wit:

August Knoker. plaintiff's son, a young man about thirty-two years of age, by occupation a longshoreman, on Saturday evening, September 3, 1898, after nine o'clock, left his home where he lived with his mother, and was not again seen by her until after his death. The evidence does not show where he went in the meanwhile, but, shortly before midnight, he rode in a Tchoupitoulas street car to Canal street. As he left the car at its station on Canal street, about opposite the end of Dorsiere street, between Decatur and Chartres streets, he remarked to the conductor and morotrneer that he was going to the lake.

Assuming for convenience of statement, and in order to be intelligible, that Canal street runs due east and west; he walked in a northwesterly direction, from the track on which the Tchoupitoulas street

car was standing (being the third track from the north side of the neutral ground), across the second track, and stopped between it and the track of the defendant, which is the first track immediately adjacent to the narrow-flagged sidewalk, which forms the northern border of the neutral ground. At that moment, car No. 41 of the defendant's line was moving westwardly, at the rate of about six or seven miles per hour, and when Knoker concluded to move across the defendant's track, it was within about 15 feet, or half its length, distant. Knoker, nevertheless, started straight across the track. The motorneer did all that a man so situated could do to avert the threatened misfortune; but, although he stopped the car within its own length, it had, in the meanwhile, struck Knoker, and when it was brought to a standstill, the unfortunate man was lying upon the sidewalk, alongside of it, his face to the sky, his feet pointing westward, with a cut about two inches in length, across the lower part of the back of his head, and slight abrasions upon the points of his elbows, as the only external marks of his injury, but with his skull so badly fractured that he died within a very few minutes.

There were only three persons who witnessed the tragedy, and their testimony, in so far as we find it material to the legal questions which we are called upon to determine, is substantially as follows:

George Taylor, a disinterested witness, sworn for plaintiff, was walking along the north side of Canal street, in the direction of Chartres, that is to say, in a westwardly direction. When he reached a point about opposite the scene of the accident he had an attack of coughing, and walked to the gutter in order to expectorate, and, at the same time, he looked out toward the neutral ground, somewhat obliquely to the rear (considered with reference to the direction in which he had been walking), to see whether a car, which he expected to take, was coming. At that instant, he saw "a man hit by a car." The man fell on the sidewalk "with his face down," the witness ran over to the spot, but just then his car came along, and he boarded it and went on home. He says: "About signals, or anything like that, I don't think I can remember hearing any at all. * * * I did not look at the car long enough to tell how quick it was going; just as I had turned to see if my car was coming, the man was struck. Now, how fast the man was going with his car, I can't say."

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"* * * But when the man was struck, he was struck, like on the side of the car—the side the guard is on.

"Q.—He was then on the pavement?

"A.—Whether he was right on the pavement, or whether he was on the track, the rail part, I can't·say. * * * He was going towards Chartres street; whether he was going that way I don't know, but his face was toward that way."

Cross-examined by counsel for the defendant, he is asked:

"Q.—I don't understand you to say that no signals were given, but that you do not recall having heard them?

"A.—As far as my memory serves me at present, I don't recall hearing any gong or signal of any kind. The car was stopped within about ten feet or so after it struck him."

Re-examined:

"Q.—It may have been twenty or thiry feet?

"A.—Probably so; may be so; I don't say exactly. I might judge ten feet, and other people might judge fifteen or twenty feet.

         *       *       *       *       *       *       *       *

"Q.—Do you remember distincly to have seen the car after it had struck the man?

"A.—I seen the car shoot past him; yes, sir.

"Q.—Shoot past him?

"A.—Past the body; yes, sir."

Wm. M. Youngblood, a disinterested witness, sworn in behalf of the defendant, had left the corner of Canal and Chartres streets, crossed to the neutral ground, and had walked about five yards on the flagging, on the lower side, in the direction of the scene of the accident, when he saw a "figure" on defendant's track, and, to use his own language, "The next thing I saw—there was a car coming along at the time—and the next thing I saw of the figure, he was lying on the right hand side of the car, right in the middle. I rushed up to him. I was the first man near him, after he was knocked down.

"Q.—Did you see the car strike the man?

"A.—Well, I saw him on the track, and the next thing, I saw him on the side; I saw the car dragging him along the side.

"Q.—How far from where the car struck him did the car stop?

"A.—Well, you understand, the car stopped almost immediately; it went along a little distance, but stopped pretty short. The car was going at a pretty good rate of speed—I think.

"Q.—Where was the car, with reference to the man's body, when you got there?

"A.—It was on the pavement.

"Q.—How far was the car past, if it was past it?

"A.—It wasn't past it yet; his head, I think, was lying in the direction of the river, and his legs in the direction of the lake; he was just between the two wheels, you know, on the side.

(By the court):

"Q.—About how far ahead of you did you see that figure?

"A.—Well, I was about five yards from Chartres street, on the neutral ground, and I saw the figure about in front of Godchaux's, and the car——"

(By Mr. Bruenn):

"Q.—Where was the car?

"A.—I don't know exactly what distance, it must have .been about three or four yards from the figure when I noticed it on the track.

"Q.—Was the car as close to the figure as that, when you first noticed it, or was it further off?

"A.—The car was about that distance.

"Q.—Coming along at a rapid speed?

"A.—Coming along at a pretty good speed. -

"Q.—Did you hear the gong ring?

"A.—I heard no gong.

"Q.—Do you know what part of the car struck the man?

"A.—I do not.

"Q.—You didn't see the car strike him?

"A.—No, sir.

"Q.—But you saw the figure at one time walking in front of the car?

"A.—Yes, sir.

"Q.—The next time you saw the figure it was alongside of the car, being dragged by the car, before it stopped?

"A.—Yes, sir; it was just like the car struck him, you know, and pushed him aside. If it hadn't been for that, I presume, it would have rolled over the body and mashed him.

"Q.—Can you state, positively, exactly where the figure was when you saw it; whether it was on the flag walk, approaching you, or whether it was on the track?

"A.—When I saw the figure it was on the track, coming in the direction of Godchaux.

(By the court):

"Q.—Walking which way?

"A.—Just as though he were crossing the track."

Alfred Lapouyade, motorneer of Car 41, sworn for defendant:

"Q.—Tell the judge what happened, and what you did?

"A.—11:52 when I left Canal and the river, Station "A;" as I left Decatur, corner of Decatur, I made a stop here, as I got in the middle of the block I saw a man standing between the two tracks, Claiborne track and Traction track; as I came near him, he attempted to go right across; of course the man was right in front of me before I could stop the car, but I made a short stop, put the reverse on the car, but I struck the man before I could manage not to hit him.

"Q.—Where was the man when you saw him?

"A.—Between the two tracks, on the neutral ground.

"Q.—What did you do when you saw the man attempt to cross?

"A.—Well, I rung my gong as hard as I could, and tried to stop the car, as I did, but I struck the man before I stopped the car.

"Q.—How far did you pass the man before you stopped the car?

"A.—Well, the man lying down, I stopped the car—he was lying down in the centre of the car, on the outside."

Cross-examined:

"Q.—When did you first see Mr. Knoker, as you came up this track from the river?

"A.—Well, I saw the man after I left Decatur street, that way; I saw him over there, but he was pretty much on the side of the Traction track, though it must have been about—I couldn't say exactly, but about fifteen steps, when the man made an attempt to cross, you see; of course, I was going at a moderate speed, five knots is our gait, we are supposed to go; I am very certain the man passed right in front of me; made an attempt to cross; he looked to me to be under the influence of liquor.

"Q.—Do you know that he was drunk?

"A.—No; but he looked, staggering around when I rang the gong. Certainly I took notice of it.

"Q.—You thought the man was drunk?

"A.—I couldn't tell whether he was drunk or not, but it looked like he staggered over there.

Knoker vs. Canal & Claiborne R. R. Co.

"Q.—You made no effort to stop the car?

"A.—Certainly I did make an effort.

"Q.—For you stopped your car so that the man lay in the middle of the car, as you have testified?.

"A.—Yes, sir.

"Q.—Why could you not stop your car before you struck the man?

"A.—Well, because I couldn't stop.

"Q.—You were going at a moderate speed?

"A.—Yes, sir.

"Q.—You say you saw this man standing on the up-town side of your track?

"A.—On the left hand side.

"Q.—That is the up-town side of your track; you saw him and you swear he made the attempt to cross?

"A.—No; he didn't make any attempt; but I saw the man as I came near him; that was the time he went over.

\*     \*     \*     \*     \*     \*     \*     \*

"Q.—Where did you find him when your car stopped?

"A.—When I stopped my car, the man was lying right in the centre on the outside.

(By the court):

"Q.—Let me understand. When you first saw this man, as you say, he was standing between the two tracks?

"A.—Yes; sir.

"Q.—Was there anything to indicate that he was going to cross your track?

"A.—No, sir; because there is lots of people standing there all day.

\*     \*     \*     \*     \*     \*     \*     \*

"Q.—You say that, without you knowing he was going to cross, he attempted to cross, and then you tried to stop your car, and rang your bell?

"A.—Yes, sir; when he made that; he must have been about fifteen steps when he made the attempt to cross.

(By Mr. Bruenn):

"Q.—How far was he away from the car when he made the attempt; how far was your car away from him when he started to go across?.

"A.—He must have been about as far as from here to that store.

"Q.—That is twenty feet?

"A.—Yes, sir.

"Q.—And yet you stopped your car in half a length after you struck him?

"A.—Yes, sir."

This is the substance of the testimony as to the immediate facts leading up to the death of the plaintiff's son. Other witnesses were examined, as to what occurred afterwards; as to the comparative width of defendant's cars and tracks; as to the comparative noiseless- ness of said cars; as to whether it would be advisable to have a bell attached to the axle which would ring continuously, etc., but we are unable to discover that their testimony has any appreciable bearing upon the vital question: considering the testimony of the witnesses who saw the occurrence, was the defendant at fault for having run down August Knoker? And that question, we think, must be an- swered in the negative.

The theory of the plaintiff's counsel, that the deceased was struck by the car whilst he was walking on the sidewalk, with his back to the car, is not sustained by the proof. On the contrary, we think it affirm- atively established that he was on the track when he was struck, and that, without having previously given any indication of an intention so to do, he got on the track within so short a distance in front of the moving car that it was impossible to stop it before striking him. We are of opinion that the learned counsel for plaintiff is in error in assuming, from Youngblood's testimony, that the decedent was "dragged" by the car after he was struck, and hence that the motor- neer was negligent with regard to stopping the car. It is true that Youngblood makes use of the word "dragged," but being asked by the counsel:

"Q.—The next time you saw the figure it was alongside of the car, being dragged by the car before it stopped," he answers: "A.—Yes, sir; it was just like the car struck him, you know, and pushed him aside. If it had not been for that, I presume, it would have rolled over the body and mashed him." From which it is evident that the word "dragged" did not express the idea that he intended to convey. And this is made still plainer by the fact that when the car was stopped, within half of its length, the body was alongside of it—not attached to it, and bore no indications of having been dragged. We think that "being dragged" and being "pushed aside" are too very different things, and that the latter is what the witness testified to as having happened. We are of opinion that the learned counsel is also

in error in assuming that the motorneer saw the decedent staggering around, whilst still at a distance, and in arguing therefrom that he should have been particularly on his guard, upon the assumption that the decedent was intoxicated. The only staggering to which the motorneer testifies took place, if at all, at the moment when the decedent attempted to cross defendant's track, in front of the approaching car, and, at that moment, we are satisfied that he did all that could have been done to avert the accident. He and the conductor testify that he rang his gong, and stopped the car, and we are inclined to believe that he did both. But that he stopped the car with extraordinary promptness is absolutely certain; and we think, in view of his situation at the moment, that, even if he had devoted all his faculties to that act, and had not rung the gong at all, he would not have been to blame. It is a mere matter of conjecture as to how it happened that the decedent received a horizontal cut through the scalp, upon the back of the head, and why, with such a cut, one or more of the fractures in the skull should have been vertical. We might theorize upon the subject, but to no useful purpose. He was struck by the car and was killed. His misfortune, and that of his poor mother, must appeal to the sympathy of every heart capable of feeling. It was pitiable, almost beyond expression. But, to fasten upon the motorneer of the car the responsibility for his taking off would be cruel and unjust. The case is clearly within the rule laid down in Snider vs. Railroad Co., 48th Ann., 12; Hoelzel vs. Railroad Co., 49th Ann., 1302; Webster vs. Railroad Co., 51st Ann., 291; Farrar vs. Railroad Company, 52 Ann., 417; Ponzano vs. Railroad Co., 52 Ann., 245. And the judgment appealed from is affirmed.